UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CHARLES BUSCEMI,

               Plaintiff,

       v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

             Defendant.

_____

<u>DECISION & ORDER</u>

13-CV-6088P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Charles Buscemi ("Buscemi) brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for Supplemental Security Income and Disability Insurance Benefits ("SSI/DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge.  (Docket # 10).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Docket ## 8, 9).  For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and complies with applicable legal standards.  Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Buscemi's motion for judgment on the pleadings is denied.

## BACKGROUND

### I.   Procedural Background

Buscemi applied for DIB on January 3, 2012 and for SSI on January 23, 2012, alleging disability beginning on March 1, 2011, due to depression, anxiety and difficulty being around other people.  (Tr. 156-58, 165, 204).[1]  On January 26, 2012, Buscemi amended his application for SSI alleging his disability began on April 1, 2011.  (Tr. 174).  On April 12, 2012, the Social Security Administration denied both of Buscemi's claims for benefits, finding that he was not disabled.  (Tr. 64-66).  Buscemi requested and was granted a hearing before Administrative Law Judge Brian Kane (the "ALJ").  (Tr. 81-82, 96-99).  The ALJ conducted a hearing in Rochester, New York on August 2, 2012.  (Tr. 25-63).  Buscemi was represented at the hearing by his attorney, Justin Goldstein, Esq.  (Tr. 3, 25).  In a decision dated August 17, 2012, the ALJ found that Buscemi was not disabled and was not entitled to benefits.  (Tr. 12-20).

On December 26, 2012, the Appeals Council denied Buscemi's request for review of the ALJ's decision.  (Tr. 1-4).  Buscemi commenced this action on February 19, 2013, seeking review of the Commissioner's decision.  (Docket # 1).

### II.   Non-Medical Evidence

#### A.   Buscemi's Applications for Benefits

Buscemi was born on October 12, 1962 and is now fifty-one years old.  (Tr. 158).  Buscemi obtained his GED in 1983.  (Tr. 205).  Buscemi's previous work history includes employment as a plastics mold injector, production worker and warehouse worker for various

---

[1]  The administrative transcript shall be referred to as "Tr. __."

temporary agencies. (*Id.*). At the time of his application, Buscemi was taking Denlasaxine, Gabapentin and Seroquel for his depression and anxiety. (Tr. 206).

###    B.    The Disability Analyst's Assessment

On April 12, 2012, disability analyst P. Izakson ("Izakson") completed a non-severe impairment checklist. (Tr. 212). Izakson opined that Buscemi did not suffer from abnormalities in any of his physical functions, including walking, lifting, reaching, seeing, standing, pushing, carrying, hearing, sitting, pulling, handling or speaking. (*Id.*). According to Izakson, the evidence did not establish more than a slight abnormality of physical functioning. (*Id.*).

## III.    Relevant Medical Evidence[2]

On June 20, 2011, Buscemi began receiving mental health treatment at Unity Health System. (Tr. 312). During his first visit, Buscemi met with Sarah Lechner ("Lechner"), LMSW, for a comprehensive medical evaluation. (*Id.*). Lechner diagnosed Buscemi with major depressive disorder, recurrent, severe, without psychotic features. (*Id.*). Buscemi reported that he has experienced depression since he was seventeen years old and that his current symptoms include disruptive sleep, sadness, difficulty concentrating, poor view of self, feelings of emptiness and worthlessness, decreased interest and pleasure, low energy and restlessness. (Tr. 313). In addition, Buscemi reported feelings of anxiety and concerns that people were watching

---

[2] Buscemi does not challenge the ALJ's physical RFC assessment. Thus, records pertaining to Buscemi's physical impairments are not summarized herein. (*See* Tr. 248-70, 379-81).

him.  (*Id.*).  Buscemi reported experiencing these symptoms for the past five to ten years.  (*Id.*).

Buscemi reported that he does not have any hobbies and frequently watches television.  (Tr. 314).

Buscemi reported that he had previously received mental health treatment and had

been diagnosed with bipolar disorder.  (*Id.*).  According to Buscemi, he was prescribed

medication, but did not follow through with treatment.  (*Id.*).  Buscemi reported a history of

illegal substance use and alcohol dependency, for which he attended an inpatient rehabilitation

program in 1991.  (Tr. 315-16).  According to Buscemi, he last consumed alcohol in March

2011,[3] when he was arrested for driving while intoxicated.  (Tr. 317, 319, 321).

Buscemi reported that he was raised by his mother and father, who are still

married, and he has two sisters and two brothers.  (Tr. 318).  According to Buscemi, his father

was physically abusive, and he has a strained relationship with his family.  (Tr. 318, 320).

Buscemi was expelled from high school in tenth grade because he threw a fire extinguisher down

a stairwell.  (Tr. 319).  Buscemi subsequently obtained his GED.  (*Id.*).  Buscemi was married in

1998 and divorced approximately three years later.  (*Id.*).

Buscemi last worked in mid-March 2011, approximately the same time that he

was arrested for DWI.  (*Id.*).  According to Buscemi, that position was his third job during the

previous four months.  (*Id.*).  Buscemi reported that he had difficulty remembering simple

work-related tasks and difficulty maintaining concentration.  (*Id.*).

---

[3] Treatment notes from Unity Health System contain conflicting information concerning Buscemi's
reported last date of alcohol consumption, with some notes indicating March 2011 and others indicating March
2010.  (*Compare* Tr. 317 *with* Tr. 319).  The treatment notes are dated June 2011 and indicate that Buscemi reported
ongoing legal issues concerning his arrest for driving while intoxicated.  March 2011 is consistent with the date
indicated in treatment notes from the University of Rochester Medical Center where Buscemi participated in a partial
hospitalization program.  (Tr. 427).

Lechner assessed that Buscemi's speech was normal and his thought forms were logical and coherent. (Tr. 320). According to Lechner, Buscemi's thought processes included helplessness, hopelessness and worthlessness. (*Id.*). Buscemi's mood and affect were depressed, but he exhibited good insight and judgment. (Tr. 321). Buscemi scored twenty on the Quick Inventory of Depressive Symptomatology ("QIDS"), indicating a severe level of depressive symptoms. (Tr. 323).

Lechner referred Buscemi to the partial hospitalization program at University of Rochester Medical Center ("URMC"). (Tr. 427). According to the treatment notes, Lechner referred Buscemi because of his "worsening symptoms of depression and anxiety resulting in inability to function at work or family roles." (*Id.*). During intake, Buscemi reported both physical and sexual abuse during his childhood. (Tr. 428). According to Buscemi, he has had unsuccessful long-term relationships with women. (*Id.*). Buscemi reported difficulty maintaining employment due to his inability to perform adequately at his job as a result of his anxiety. (*Id.*).

Buscemi reported a history of substance use, including alcohol, marijuana, cocaine and opiates. (*Id.*). According to Buscemi, he had not used any controlled substances in at least three years and had not consumed alcohol since his March 2011 DWI arrest. (*Id.*). Prior to that time, according to Buscemi, he had been sober for approximately two years. (*Id.*). The intake interviewer, Frances McCarthy ("McCarthy"), RN, characterized Buscemi as "evasive," particularly with respect to his sobriety. (Tr. 428-29, 31). McCarthy noted that Buscemi expressed concern over his placement into a program addressing substance abuse, rather than depression. (Tr. 431).

5

McCarthy opined that Buscemi's mood and affect were anxious and depressed and that he expressed negative ruminations, but showed no evidence of hallucinations. (Tr. 429). According to McCarthy, Buscemi's memory was intact, and he exhibited average cognitive intelligence with poor concentration. (*Id.*). McCarthy diagnosed Buscemi with major depressive disorder, severe without psychotic features, with a Global Assessment Functioning ("GAF") of 38, and opined that Buscemi should be admitted to the partial hospitalization program due to the severity of his symptoms. (Tr. 432).

Buscemi's treatment plan at URMC included psychotherapy sessions with Peter Teall ("Teall"), LCSW-R, medication evaluation and monitoring by Michelle Stouffer ("Stouffer"), NP, and group therapy. (Tr. 425). During treatment, Buscemi reported oversleeping and periods of high anxiety. (Tr. 420). Teall opined that Buscemi was "evasive" and noted that the treatment team felt that Buscemi was "malingering." (*Id.*). Buscemi indicated that he was interested in medical treatment for his anxiety. (*Id.*). Stouffer told Buscemi that he was not a candidate for certain prescription controlled substances given his history of alcohol abuse and instead prescribed Prozac, Hydroxyzine, Neurontin and Gabapentin. (Tr. 271, 410, 420). Buscemi was discharged on July 19, 2011. (Tr. 271). Buscemi's attendance during the program was good, but his participation during group sessions was limited. (*Id.*). At discharge, Buscemi's depression had not improved, although his anxiety had lessened. (*Id.*). Buscemi was diagnosed with major depressive disorder, moderate to severe, no psychosis, with a GAF of 45 at discharge. (*Id.*).

A treatment plan completed by Lechner on July 26, 2011 indicated that Fluoxetine, Gabapentin and Hydroxyzine had been prescribed to him during the partial

6

hospitalization program at URMC.  (Tr. 308).  According to Lechner, Buscemi reported continued feelings of depression.  (*Id.*).  On September 8, 2011, Lechner completed another mental health treatment plan.  (Tr. 304-07).  Lechner noted that Buscemi had attended two of the three scheduled therapy sessions and had met with Nusrat Shafiq ("Shafiq"), MD, to evaluate his medications.  (*Id.*).  Shafiq prescribed Prozac, Buapor and Neurontin.  (*Id.*).

On September 14, 2011, Shafiq completed a mental health evaluation of Buscemi. (Tr. 293).  During the evaluation, Buscemi reported that he was currently living with his former brother-in-law.  (Tr. 294).  According to Buscemi, he had been sober for the past three months. (*Id.*).  Buscemi reported ongoing depression accompanied by disrupted sleep, sadness, difficulty concentrating, poor view of self, feelings of emptiness and worthlessness, decreased interest and pleasure, low energy and feelings of restlessness.  (*Id.*).  Buscemi reported ongoing anxiety, but thought that his medications were alleviating some of the anxiety.  (Tr. 302).  Shafiq diagnosed Buscemi with major depressive disorder, rule out dysthamia, anxiety disorder not otherwise specified, and alcohol dependence.  (*Id.*).

On November 5, 2011, Lechner completed a Psychological Assessment for Determination of Employability form.  (Tr. 445-48).  Lechner noted that Buscemi had previously been hospitalized for substance abuse treatment, had occasionally lost employment, had occasionally acted inappropriately with others and that his behavior frequently interfered with his activities of daily living.  (Tr. 446).  Lechner diagnosed Buscemi with major depressive disorder, anxiety disorder not otherwise specified, alcohol dependence and a GAF of 53.  (Tr. 447). According to Lechner, Buscemi was moderately impaired in his ability to maintain attention and

concentration and in his ability to demonstrate the capacity to perform low stress and simple tasks. (*Id.*).

A treatment plan completed by Lechner dated December 7, 2011 indicates that Buscemi's medications had been modified. (Tr. 288). Buscemi was prescribed Effexor, Seroquel and Neurontin. (*Id.*). According to Lechner, Buscemi continued to participate in therapy sessions and was consistently attending his appointments and taking his medications. (Tr. 291). During a therapy session on December 8, 2011, Lechner and Buscemi explored Buscemi's negative thought patterns and depressed mood. (Tr. 349). Lechner recommended Cognitive Behavioral Group Therapy ("CBT"). (*Id.*). During the session, Lechner assessed Buscemi's speech as normal and his thought form as logical and coherent. (Tr. 350). Buscemi exhibited helpless and hopeless thought content, and his mood and affect were depressed, although his insight and judgment were good. (*Id.*).

On December 22, 2011, Buscemi attended another therapy session with Lechner. (Tr. 345-46). Buscemi reported that he was sentenced to jail during the weekends for the next six weeks as a consequence of his DWI conviction. (*Id.*). Buscemi told Lechner that he did not believe his prescription for Effexor was effective and he continued to have negative thoughts and hopelessness. (*Id.*). Again, Lechner assessed Buscemi's speech as normal and his thought form as logical and coherent with helpless and hopeless thought content. (*Id.*). According to Lechner, Buscemi's mood and affect were depressed, although his insight and judgment were good. (*Id.*).

On December 28, 2011, Buscemi called Unity Health System and reported that Effexor was increasing his irritability. (Tr. 344). Buscemi wanted to discontinue it immediately. (*Id.*). Buscemi reported that Neurontin and Seroquel were alleviating his anxiety. (*Id.*). Shafiq

counseled Buscemi regarding discontinuing Effexor and prescribed Cymbalta.  (*Id.*).  Buscemi

attended a follow-up appointment with Shafiq on January 3, 2012, and reported the absence of

withdrawal symptoms.  (Tr. 338).  Buscemi cancelled his therapy appointment with Lechner on

January 5, 2012.  (Tr. 337).

On January 19, 2012, Buscemi attended a therapy session with Lechner.  (Tr.

333).  During the session, Buscemi reported an improved mood since starting Cymbalta and that

he was spending more time with his family.  (*Id.*).  Buscemi continued to experience feelings of

hopelessness.  (*Id.*).  Buscemi attended another therapy session on February 9, 2012, during

which he expressed feelings of anger and hurt relating to his father.  (Tr. 330).  Buscemi

exhibited thoughts of guilt and worthlessness with a depressed mood and affect.  (Tr. 331).

Buscemi met with Shafiq on February 20, 2012.  (Tr. 324-29).  Buscemi reported

that Neurontin and Seroquel were alleviating his anxiety, but that he continued to experience

decreased energy and motivation.  (Tr. 324).  According to Buscemi, Cymbalta helped to

improve his mood, but was not completely effective.  (Tr. 325).  Buscemi reported that his

former brother-in-law and his family have been supportive.  (*Id.*).  Shafiq increased Buscemi's

Cymbalta dosage.  (*Id.*).

On March 2, 2012, state examiner Dr. Kavitha Finnity ("Finnity") conducted a

consultative psychiatric evaluation of Buscemi.  (Tr. 375-78).  During the evaluation, Buscemi

reported that he was divorced and that he lived with his former brother-in-law. (*Id.*).  Buscemi

reported that he obtained his GED in 1983 and had stopped working in March 2011.  (*Id.*).

Buscemi reported that he has difficulty sleeping and experiences symptoms of

depression, including dysphoric mood, hopelessness, irritability, loss of interest, loss of energy

and social withdrawal.  (*Id.*).  He also reported some anxiety.  (*Id.*).  Buscemi reported that he is

able to take care of his own personal hygiene and can cook, clean and wash the laundry.  (*Id.*).

According to Buscemi, he can manage his own finances and has a good relationship with his

family, but does not socialize and does not have any hobbies.  (*Id.*).

Upon examination, Finnity noted that Buscemi appeared appropriately dressed

and well-groomed, with normal gait, posture and eye contact.  (*Id.*).  Finnity opined that Buscemi

had fluent, clear speech with adequate language, coherent and goal-directed thought processes,

depressed affect, dysthymic mood, clear sensorium, full orientation, and average intellectual

functioning with a general fund of information appropriate to his experience.  (*Id.*).  Finnity noted

that Buscemi's attention and concentration were intact.  (*Id.*).  Finnity found Buscemi's recent

and remote memory skills intact.  (*Id.*).  According to Finnity, Buscemi could recall three out of

three objects immediately and two out of three objects after five minutes, and he could complete

five digits forward and three back.  (*Id.*).

According to Finnity, Buscemi could follow and understand simple directions and

instructions, perform simple tasks, maintain attention and concentration and a regular schedule,

learn new tasks and perform complex tasks and make appropriate decisions, although Buscemi

has difficulty relating with others and dealing with stress.  (*Id.*).  According to Finnity, Buscemi

could manage his own finances and his prognosis was good.  (*Id.*).

On April 12, 2012, agency medical consultant Dr. M. Apacible ("Apacible")

completed a Psychiatric Review Technique.  (Tr. 382-95).  Apacible concluded that Buscemi's

mental impairments did not meet or equal a listed impairment.  (Tr. 385, 390).  According to

Apacible, Buscemi suffered from no limitations in his activities of daily living, moderate

limitations in his ability to maintain social functioning and mild limitations in his ability to

maintain concentration, persistence or pace. (Tr. 392). In addition, according to Apacible,

Buscemi had not suffered any episodes of deterioration. (*Id.*). Apacible completed a mental

residual functional capacity ("RFC") assessment. (Tr. 396-99). Apacible opined that Buscemi

suffered from moderate limitations in his ability to complete a normal workday and workweek

without interruptions and to perform at a consistent pace without an unreasonable number and

length of rest periods and to respond appropriately to changes in a work setting. (*Id.*). According

to Apacible, Buscemi is able to perform simple work in a low contact setting. (Tr. 398).

Buscemi met with Shafiq again on April 20, 2012. (Tr. 433-38). Buscemi

reported that he continued to experience decreased energy and motivation, although he believed

that his medications were helping to improve his mood. (*Id.*). According to Buscemi, he had

been trying to participate in more activities and had attended a family event, although with

difficulty. (*Id.*). Buscemi reported that he feels sad on bad days and on other days he is gloomy.

(*Id.*). Buscemi had begun attending CBT sessions and reported that he believed they would help

him address his negative thoughts. (*Id.*).

On May 4, 2012, Lechner completed another Psychological Assessment for

Determination of Employability form for Buscemi. (Tr. 449-52). Lechner noted that Buscemi

had frequently lost employment and frequently acted inappropriately with others. (Tr. 450).

Lechner diagnosed Buscemi with major depressive disorder, recurrent, moderate, anxiety

disorder not otherwise specified, alcohol dependence in partial remission and a GAF of 65. (Tr.

451). According to Lechner, Buscemi was moderately impaired in his ability to follow,

understand and remember simple instructions and directions and in his ability to maintain

attention and concentration.  (*Id.*).  Lechner opined that Buscemi was very limited in his ability to perform simple and complex tasks independently.  (*Id.*).  According to Lechner, Buscemi would be able to work fifteen hours per week at a job requiring him to perform simple tasks with supervision to provide assistance in retaining and directions.  (Tr. 451-52).  In addition, according to Lechner, Buscemi should avoid high stress or high traffic environments.  (Tr. 452).

On June 4, 2012, Lechner completed a treatment plan review.  (Tr. 439-42). Lechner noted that Buscemi's goal was to obtain employment and that he had been attending CBT sessions weekly.  (*Id.*).  Buscemi continued to experience depressive symptoms and low self-esteem, although he had decreased anxious symptoms.  (*Id.*).  Buscemi reported that he continued to take his medications as prescribed and to attend his appointments with Shafiq to monitor his medications.  (*Id.*).

On June 28, 2012, Buscemi attended a therapy session with Lechner.  (Tr. 443-44).  During the session, Lechner expressed concern regarding Buscemi's failure to attend CBT sessions or individual therapy sessions.  (*Id.*).  According to Buscemi, he stopped attending CBT sessions because he "wasn't getting anything from it anymore."  (*Id.*).  In addition, Buscemi admitted that he had not been utilizing the skills he had learned in his daily life.  (*Id.*).  Buscemi agreed with Lechner's assessment that his treatment had "platteaued."  (*Id.*).  Buscemi indicated that he would attend both group and individual therapy sessions in the future.  (*Id.*).  Buscemi exhibited thoughts of helplessness with a depressed mood and affect.  (*Id.*).

IV.     **Proceedings before the ALJ**

At the administrative hearing, Buscemi testified that he lives with his former brother-in-law, who used to be married to Buscemi's sister.  (Tr. 32, 51).  Buscemi previously was married, but obtained a divorce in 2001.  (Tr. 51).  Buscemi testified that he has not been in a relationship for the past two or three years.  (*Id.*).  According to Buscemi, he obtained his GED in 1983.  (Tr. 33).  Buscemi testified that he maintains a relationship with his brother and an older sister.  (Tr. 55).  In addition, Buscemi reported that his anxiety medication had helped him to become more social and he was able to attend more family events, such as birthday parties. (Tr. 47).

Buscemi testified he is able to complete chores around the house, including the dishes, cooking and cleaning.  (Tr. 52).  In addition, Buscemi performs the yard work at his home.  (Tr. 53).  Buscemi's former brother-in-law provides him transportation to go shopping, although Buscemi tries to limit the time he spends in stores.  (Tr. 52).  Buscemi watches television during the day, primarily thirty-minute sitcoms, with which he sometimes becomes bored.  (Tr. 50).  In addition, Buscemi tries to ride his bike daily for approximately thirty minutes.  (Tr. 56).

Buscemi testified that he had a driver's licence, but that it was suspended as a result of his DWI conviction.  (Tr. 32).  According to Buscemi, he has three prior convictions for DWI.  (Tr. 33).  Buscemi testified that he previously suffered from problems with alcohol consumption, particularly when he was twenty years old, but that he has stopped abusing alcohol, other than a relapse in 2011 when he was arrested for DWI.  (Tr. 42, 54-55).  Buscemi explained that he was having a bad day and was frustrated about his life.  (Tr. 42-43).  According to

Buscemi, he went to a friend's house, consumed beer and was pulled over on his way home. (*Id.*). Since that date, Buscemi testified, he has primarily abstained from alcohol consumption, although he did have a "beer or two" at his brother's birthday party. (Tr. 43).

Buscemi testified that he was terminated from his last job in March 2011. (Tr. 41). Buscemi could not recall whether he was terminated before or after his DWI arrest. (*Id.*). According to Buscemi, he received a message on his answering machine indicating that his services were no longer needed. (Tr. 41-42). Buscemi testified that he was not given any specific reason for his termination. (Tr. 42). At the time, he had been working for several months in a plastics factory making plastics parts. (Tr. 33). Buscemi operated an injection plastics mold machine. (Tr. 34). Buscemi received on-site training for the position. (*Id.*). According to Buscemi, another employee would set the molds, and Buscemi was responsible for pressing a button to inject the plastic and removing the plastic part from the molds. (*Id.*). Buscemi testified that he would have to inspect the plastic parts and grind away any imperfections in the parts. (Tr. 53). Buscemi worked alone or with one other person. (*Id.*). In addition, Buscemi testified that he had to interact with supervisors and with other employees during the lunch break. (*Id.*). According to Buscemi, his job responsibilities could change throughout the day. (*Id.*). Buscemi testified that he felt overwhelmed at this job and would often forget what he was supposed to do. (Tr. 40). In addition, Buscemi testified that he would often need redirection through the day. (Tr. 54).

Buscemi previously had been employed in another plastics injection mold factory in the same capacity. (Tr. 34). Prior to that job, Buscemi was placed at Kodak for eighteen months in a position monitoring a machine that made emulsions that were placed into large tubs.

14

(Tr. 35-36).  Once the tubs were filled, Buscemi had to move and stack the tubs onto a pallet.

(*Id.*).  Buscemi also performed other jobs at Kodak on a contract basis, including assembly line

and forklift operator.  (Tr. 36).  Prior to that, Buscemi spent a summer employed by a roofing

company repairing roofs on commercial buildings.  (Tr. 37-38).  Buscemi also worked for four

years at Rochester General Hospital in maintenance, cleaning emergency rooms, hallways and

vacuuming the carpets.  (Tr. 39-40).

       Buscemi testified that most of his employment was obtained through temporary

employment agencies and that he was never hired for permanent positions.  (Tr. 39).  Buscemi

testified that he did not have attendance issues and was never told why he was not hired on a

permanent basis.  (*Id.*).

       Buscemi attends monthly therapy sessions with Lechner and meets with Shafiq

every other month.  (Tr. 44).  Buscemi testified that he completed a partial hospitalization

program during which he attended group activities and had individual therapy sessions.  (Tr. 45).

Buscemi also completed a CBT program at Unity Health System, although it was difficult for

him to be in a group setting.  (Tr. 46).  According to Buscemi, none of the four medications

prescribed to him for depression have successfully managed his symptoms.  (*Id.*).  Buscemi

testified that his medication for anxiety has provided some relief.  (Tr. 47).  According to

Buscemi, his medications cause consistent fatigue.  (*Id.*).

       Buscemi testified that his depression causes him to have good days and bad days.

(Tr. 48-49).  According to Buscemi, he experiences bad days approximately three times each

month, during which he has difficulty getting out of bed and has no desire to be around other

people or engage in any activities.  (Tr. 48).  On a good day, Buscemi attempts to get out and to

be more sociable.  (Tr. 49).  Buscemi estimated that two and one-half to three weeks per month consist of good days.  (*Id.*).

A vocational expert, Julie Andrews ("Andrews"), also testified during the hearing. (Tr. 58-63, 127).  The ALJ first asked Andrews to characterize Buscemi's previous employment. (Tr. 59).  According to Andrews, Buscemi had previously been employed as an industrial truck operator, an injection molding machine tender, an institutional cleaner and a roofer.  (Tr. 59-60).

The ALJ then asked Andrews whether a person of the same age as Buscemi, with the same education and vocational profile, who was able to lift fifty pounds occasionally and to stand, walk and sit for up to six hours or more, but was limited to occasional interaction with coworkers, the general public and supervisors, would be able to perform any of the work that Buscemi previously performed.  (Tr. 60).  Andrews opined that such a person would be able to perform the requirements of the industrial truck operator and the injection molding machine tender positions.  (*Id.*).  The ALJ then asked Andrews to assume the same limitations, but to add the additional limitation that the individual could only occasionally attend and concentrate for two hours at a time and must be restricted to three to four step processes.  (*Id.*).  Andrews responded that both the industrial truck operator and injection molding machine tender positions would still be viable for such an individual.  (Tr. 61).  Finally, the ALJ asked Andrews to assume further that the individual would be off-task twenty percent or more of the day, outside of normal breaks.  (*Id.*).  Andrews responded that such an individual could not perform any of the past relevant work on a full-time competitive basis.  (*Id.*).

## DISCUSSION

### I.     Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its

weight." *Williams ex rel Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent

they are supported by substantial evidence, the Commissioner's findings of fact must be

sustained "even where substantial evidence may support the claimant's position and despite the

fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise."  *Matejka v.*

*Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d

60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

   A person is disabled if they are unable "to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).  When assessing

whether a claimant is disabled, the ALJ must employ a five-step sequential analysis.  *See Berry v.*

*Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*).  The five steps are:

  (1) whether the claimant is currently engaged in substantial
     gainful activity;

  (2) if not, whether the claimant has any "severe impairment"
     that "significantly limits [the claimant's] physical or mental
     ability to do basic work activities";

  (3) if so, whether any of the claimant's severe impairments
     meets or equals one of the impairments listed in Appendix
     1 of Subpart P of Part 404 of the relevant regulations;

  (4) if not, whether despite the claimant's severe impairments,
     the claimant retains the residual functional capacity to
     perform his past work; and

  (5) if not, whether the claimant retains the residual functional
     capacity to perform any other work that exists in significant
     numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

A.     **The ALJ's Decision**

In his decision, the ALJ followed the required five-step analysis for evaluating disability claims. (Tr. 12-20). Under step one of the process, the ALJ found that Buscemi had not engaged in substantial gainful activity since March 1, 2011, the alleged onset date. (Tr. 14). At step two, the ALJ concluded that Buscemi has the severe impairments of major depressive disorder, anxiety disorder, alcohol abuse in apparent remission and not material, left upper extremity difficulties, status-post fracture. (*Id.*). At step three, the ALJ determined that Buscemi does not have an impairment (or combination of impairments) that meets or medically equals one of the listed impairments. (Tr. 14-16). With respect to Buscemi's mental impairments, the ALJ found that Buscemi suffered from moderate difficulties in maintaining concentration, persistence or pace and mild limitations in social functioning and activities of daily living. (*Id.*). The ALJ concluded that Buscemi had the RFC to perform medium work, including lifting and carrying up to fifty pounds and sitting, standing and walking for six hours in each eight-hour workday, except that he is only able to sustain attention and concentration for up to two hours at a time and only has the ability to perform three to four step processes. (Tr. 16). At step four, the ALJ determined that Buscemi was able to perform past work as an industrial truck operator and an injection

molding machine tender.  (Tr. 19).  Accordingly, the ALJ found that Buscemi is not disabled.
(*Id.*).

       **B.**       **Buscemi's Contentions**

       Buscemi contends that the ALJ's determination that he is not disabled is not
supported by substantial evidence.  (Docket # 9-1).  First, Buscemi maintains that the ALJ's RFC
determination is not supported by substantial evidence because the ALJ failed to assign any
weight to Lechner's opinions, let alone the significant weight that it deserves.  (*Id.* at 10-16).
Further, Buscemi maintains that the ALJ failed to incorporate into his RFC the limitations
identified by Finnity and Apacible.  (*Id.* at 16-18).  Next, Buscemi maintains that the ALJ's
credibility analysis is based upon an inaccurate and incomplete recitation of the record.  (*Id.* at
18-21).  Finally, Buscemi maintains that the testimony of the vocational expert cannot provide
substantial evidence at step four because it was inconsistent with Dictionary of Occupational
Titles ("DOT") and was based upon an RFC that did not fully account for Buscemi's limitations.
(*Id.* at 22-24).  In addition, Buscemi maintains that the ALJ failed to inquire into the mental
demands associated with Buscemi's previous employment.  (*Id.*).


**II.**      **Analysis**

       **A.**      **Mental RFC Assessment**

       I turn first to Buscemi's contentions that the ALJ erred by failing to assign a
particular weight to Lechner's opinion and, in any event, erred by failing to afford it "significant
weight."  According to Buscemi, the ALJ's error was not harmless because Lechner opined that

Buscemi suffered from limitations greater than those incorporated into the ALJ's RFC determination.

An individual's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)). When making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)). "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 380 F. App'x 231 (2d Cir. 2010).

An ALJ should consider "all medical opinions received regarding the claimant." *See Speilberg v. Barnhart*, 367 F. Supp. 2d 276, 281 (E.D.N.Y. 2005) (citing 20 C.F.R. § 404.1527(d)). When evaluating medical opinions, regardless of their source, the ALJ should consider the following factors:

(1)     the frequency of examination and length, nature, and extent of the treatment relationship;

(2)     the evidence in support of the physician's opinion;

(3)     the consistency of the opinion with the record as a whole;

(4)     whether the opinion is from a specialist; and

> (5)     whatever other factors tend to support or contradict the
>          opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010); *see Speilberg v. Barnhart*, 367 F. Supp. 2d at 281 ("factors are also to be considered with regard to non-treating sources, state agency consultants, and medical experts") (citing 20 C.F.R. §§ 404.1527(d) and (e)); *House v. Astrue*, 2013 WL 422058, *3 (N.D.N.Y. 2013) ("[m]edical opinions, regardless of the source are evaluated considering several factors outlined in 20 C.F.R. §§ 404.1527(c), 416.927(c)").

Licensed clinical social workers are not considered "acceptable medical sources" under the regulations.  20 C.F.R. § 404.1513(a).  Instead, clinical social workers are considered to be "other sources" within the meaning of 20 C.F.R. §§ 404.1513(d) and 416.913(d).  As such, their opinions "cannot establish the existence of a medically determinable impairment."  *See* Social Security Ruling 06-03P, 2006 WL 2329939 at *2.  Their opinions may be used, however, "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function."  *See id.*

Social Security Ruling 06-03P recognizes that "[m]edical sources . . . , such as . . . licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists."  *Id.* at *3.  The ruling recognizes that such opinions are "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."  *Id.*  The ruling directs the ALJ "to use the same factors for evaluation of the opinions of acceptable medical sources to evaluate the opinions of medical sources who are not acceptable medical sources, including licensed social workers."  *Genovese v. Astrue*, 2012 WL 4960355,

*14 (E.D.N.Y. 2012) (internal quotations omitted).  "An ALJ is not required to give controlling

weight to a social worker's opinion; although he is not entitled to disregard it altogether, he may

use his discretion to determine the appropriate weight."  *Cordero v. Astrue*, 2013 WL 3879727,

*3 (S.D.N.Y. 2013); *Jones v. Astrue*, 2012 WL 1605566, *5 (N.D.N.Y.) ("the Second Circuit has

held that 'the ALJ has discretion to determine the appropriate weight to accord the [other

source's] opinion based on all the evidence before him") (quoting *Diaz v. Shalala*, 59 F.3d 307,

313-14 (2d Cir. 1995)), *report and recommendation adopted*, 2012 WL 1605593 (N.D.N.Y.

2012).

Buscemi is correct that the ALJ failed to articulate the specific weight he assigned

to Lechner's opinions.  That failure was harmless, however, because the ALJ's evaluation of

Lechner's opinion is evident from his decision and, in any event, the ALJ's assessment is

generally consistent with the limitations identified by Lechner.

Although the ALJ did not assign a specific weight to Lechner's opinion, I

conclude that a review of his decision permits the Court to infer the weight that he assigned the

opinion, and thus his failure does not require remand.  *See Mongeur v. Heckler*, 722 F.2d 1033,

1040 (2d Cir. 1983) ("[w]hen, as here, the evidence of record permits us to glean the rationale of

an ALJ's decision, we do not require that he have . . . explained why he considered particular

evidence unpersuasive").  In his decision, the ALJ discussed at length treatment notes from Unity

Health System and Lechner's opinions.  (Tr. 18).  Specifically, the ALJ recognized that Lechner

assessed that Buscemi had moderate limitations in his ability to maintain attention and

concentration for rote tasks and for performing low stress and simple tasks, and that Buscemi did

not have any limitations for performing simple and complex tasks independently.[4] (*Id.*).  The

ALJ also noted that Lechner limited Buscemi to working fifteen hours per week for three months.

(*Id.*).

After noting that Lechner's opinions were generally consistent with and

supportive of his RFC assessment, the ALJ discussed the opinions of Finnity and Apacible, both

of whom are acceptable medical sources, and determined to afford those opinions "significant

weight" because they were consistent with the medical record.  By recognizing that Lechner's

opinions were generally consistent with his RFC and by explicitly assigning "significant weight"

to opinions of Finnity and Apacible, the ALJ implicitly assigned some weight to the opinions of

Lechner to the extent they were supported by the record evidence and consistent with the

opinions of Finnity and Apacible's opinions.  *See Hedrick v. Colvin*, 2013 WL 2434612, *3

(W.D.N.C. 2013) ("an explicit assignment of weight to one opinion may stand in as an implicit

assignment of lesser weight to another").  Accordingly, the Court concludes that the ALJ's

failure to assign a specific weight to Lechner's opinion was harmless because the decision

permits the conclusion that the ALJ afforded some weight to the opinion of Lechner, but afforded

the opinions of Finnity and Apacible greater weight because those opinions were consistent with

the record evidence.

In any event, the ALJ engaged in a detailed discussion of Lechner's findings,

which were generally consistent with the ALJ's RFC assessment; any failure to assign a specific

---

[4] Lechner's opinions are inconsistent with respect to this limitation.  (*Compare* Tr. 447 *with* Tr. 451).  On November 5, 2011, she opined that Buscemi had no limitation is his ability to perform simple and complex tasks independently, but on May 4, 2012, found him to be very limited in his abilities to perform simple and complex tasks.  (*Id.*).  Similarly, in her November 2011 opinion, Lechner opined that Buscemi had moderate limitations in his ability to perform low stress and simple tasks, but in her May 2012 opinion concluded that he had no such limitations.  (*Id.*).

weight or "significant weight" to the opinion was thus harmless and does not require remand.
*See Arguinzoni v. Astrue*, 2009 WL 1765252, *9 (W.D.N.Y. 2009) (ALJ's failure to assign
weight to medical opinions was harmless; "[t]he ALJ engaged in a detailed discussion of the
medical opinions in the record and his determination that the plaintiff was not disabled does not
conflict with the medical opinions"); *Pease v. Astrue*, 2008 WL 4371779, *8 (N.D.N.Y. 2008)
("[t]he ALJ provided a detailed summary and analysis of the reports and records of all treating
and examining physicians[;] . . . [t]herefore, the ALJ's failure to comment on the weight of the
evidence was harmless error, and does not provide a basis for a remand to the Commissioner");
*Jones v. Barnhart*, 2003 WL 941722, *10 (S.D.N.Y. 2003) ("[the ALJ] engaged in a detailed
discussion of [the opinions], and his decision does not conflict with them[;] [t]herefore, the
ALJ's negligence was harmless error, and does not provide a basis for a remand to the
Commissioner"); *see also Ryan v. Astrue*, 650 F. Supp. 2d 207, 217 (N.D.N.Y. 2009) ("despite
granting little weight to [the doctor's] opinions, [the ALJ] accounted for [p]laintiff's difficulties
with concentration and stress in his RFC[;] [t]herefore, had the ALJ opted to grant [the doctor] a
greater weight, it would not have affected his RFC").

> Buscemi contends that the ALJ's failure to assign a specific weight or to assign
significant weight to Lechner was not harmless because Lechner found greater limitations than
those incorporated into the ALJ's RFC.  Specifically, Buscemi contends that Lechner assessed
him to be moderately limited in his ability to maintain attention and concentration, perform low
stress jobs and simple tasks and understand and remember simple instructions.  (Docket # 9-1 at
12).  In addition, Lechner opined that Buscemi could work for fifteen hours per week, but needed
to be provided supervision, a low stress environment and simple tasks.  (*Id.* at 12-13).  According

to Buscemi, the ALJ's assessment failed to incorporate his limitations involving concentration, stress and simple work. (*Id.*). I disagree with Buscemi because I conclude that the ALJ's RFC assessment incorporated each of these limitations.

With respect to Buscemi's ability to maintain concentration and attention, Lechner opined that Buscemi was moderately limited, meaning that he would have difficulty functioning more than 10-25% of the time, or approximately two hours of an eight-hour workday. (Tr. 447, 451). Despite the fact that neither Finnity or Apacible identified any limitations with attention or concentration, the ALJ specifically incorporated Lechner's opinion into his RFC assessment by incorporating the limitation that Buscemi could only sustain attention and concentration for up to two hours at a time. (Tr. 16). Buscemi fails to articulate or to provide any support for his contention that Lechner's conclusion that he was moderately limited in his ability to maintain concentration and attention required the ALJ to conclude that Buscemi could not maintain concentration and attention for up to two hours at a time.

Similarly, Lechner opined that Buscemi was moderately limited in his ability to perform simple tasks and that he was very limited in his ability to perform simple and complex tasks independently.[5] Lechner opined that Buscemi would be able to perform simple tasks with supervision. (Tr. 452). Lechner's opinions are generally consistent with the opinions of Finnity and Apacible, both of whom opined that Buscemi could perform simple work. (Tr. 377, 398). The ALJ incorporated these limitations into his RFC assessment by limiting Buscemi to three to four step processes. (Tr. 16). Buscemi contends that Lechner's opinion is inconsistent with the

---

[5] As discussed above, Lechner offered inconsistent opinions with respect to this limitation. (*Compare* Tr. 447 *with* Tr. 451).

conclusion that Buscemi can perform three to four step processes, but does not provide any support for the contention that Lechner's findings are inconsistent with the ALJ's RFC. Indeed, an assessment that a claimant can perform three to four step processes is not inconsistent with an opinion that the claimant can perform simple work. *See Lugo v. Colvin*, 2014 WL 2865848, *16 (W.D.N.Y. 2014) (rejecting claimant's argument that limitation to simple work required an RFC assessment that claimant could only perform one or two-step processes; "the ALJ's finding that [p]laintiff could perform tasks requiring three or four steps is supported by substantial evidence").

Finally, Buscemi contends that the ALJ erred by failing to incorporate into the RFC assessment Lechner's opinion that Buscemi should avoid high stress environments. (Docket # 9-1 at 13). Buscemi argues that the ALJ likewise erred by failing to incorporate similar limitations by Finnity and Apacible into his RFC assessment. (Docket # 9-1 at 17; Docket # 14 at 3-4). Specifically, Buscemi contends that Finnity opined that Buscemi had difficulty relating with others and dealing with stress and that Apacible opined that Buscemi was only capable of performing work in a low contact setting. (Docket # 9-1 at 17). In addition, Buscemi contends that the ALJ ignored Apacible's opinion that he had moderate limitations in his ability to complete a normal workday or workweek at a consistent pace without an unreasonable number of breaks or rest periods. (*Id.* at 18).

I find Buscemi's arguments unpersuasive. The ALJ concluded that Buscemi was able to maintain concentration for up to two hours at a time and perform three to four steps processes – conclusions that are consistent with the medical opinions that Buscemi has limitations in his ability to deal with stress in the work place and in his ability to maintain

27

concentration throughout the workday.  Although the ALJ did not incorporate any limitation in his RFC assessment relating to Buscemi's ability to work with others, he did incorporate such a limitation in the hypothetical that was posed to the vocational expert.  Specifically, the ALJ asked Andrews to assume that the hypothetical individual could only have "occasional interaction with co-workers, general public and supervisors."  (Tr. 60).  Andrews opined that with this limitation, Buscemi could perform his past work as an injection molding machine tender and an industrial truck operator.  (*Id.*).  Thus, although the ALJ failed to explicitly incorporate this limitation into his RFC assessment, such error was harmless.  *See McAnally v. Astrue*, 241 F. App'x 515, 519 (10th Cir. 2007) (ALJ's failure to include limitation in his RFC was harmless where the vocational expert testified that such limitation would not affect claimant's ability to perform past work); *Pearson v. Astrue*, 2011 WL 5142730, *8 (D. Neb. 2011) ("[a]lthough the ALJ did not include an unskilled work limitation in his RFC assessment, he did address unskilled work in his hypothetical questions to the vocational expert[;] . . . [i]n light of this, the ALJ's failure to include an 'unskilled work' limitation in his RFC determination was harmless").  Accordingly, I conclude that the ALJ properly evaluated and incorporated into his RFC assessment the limitations identified in each of the medical opinions of record, even if he did not explicitly discuss each limitation.  *See Retana v. Astrue*, 2012 WL 1079229, *6 (D. Colo. 2012) (ALJ did not have to thoroughly discuss each moderate limitation; "ALJ's RFC adopted some of [doctor's] moderate limitations such as restricting plaintiff to unskilled work not involving complex tasks, reflecting plaintiff's moderate limitations in his ability to carry out detailed instructions and to maintain concentration for extended periods").

The ALJ's RFC assessment is not only consistent with the medical opinions in the record, but is well-supported by the remaining record evidence. The record demonstrates that Buscemi has been receiving mental health care since June 2011. Initially, Buscemi was assessed to have severe depressive symptoms and to be a candidate for a partial hospitalization program. Buscemi completed the program and continued to receive ongoing therapy and psychiatric medications from Lechner and Shafiq at Unity Health System. Treatment notes indicate that medication was successful in alleviating many of Buscemi's anxiety-related symptoms and in improving his mood, although he continued to experience negative feelings. Buscemi was able to attend medical appointments and group therapy programs, and his treatment plan incorporated a goal of obtaining employment. Buscemi reported that he was attending more family functions and was able to participate in more activities. In addition, Buscemi was able to perform many activities of daily living without assistance, including maintaining his personal hygiene, cooking, cleaning, completing yard work, bike riding and managing his finances. Accordingly, I conclude that the record does not support a finding of limitations greater than those assessed by the ALJ in his RFC assessment and that his determination is supported by substantial evidence.

## B.     Credibility Assessment

Next, I turn to Buscemi's contention that the ALJ's credibility analysis is flawed because it rests upon an inaccurate and incomplete recitation of the record. (Docket # 9-1 at 18-21).

An ALJ's credibility assessment should contain a two-step analysis. *Robins v. Astrue*, 2011 WL 2446371, *4 (E.D.N.Y. 2011). First, the ALJ must determine whether the evidence reflects that the claimant has a medically determinable impairment or impairments that

could produce the relevant symptom.  *Id.* (citing 20 C.F.R. 404.1529).  Next, the ALJ must

evaluate "the intensity, persistence and limiting effects of the symptom, which requires a

credibility assessment based on the entire case record."  *Id.* (citing 20 C.R.F. § 404.1529(c)).

The relevant factors for the ALJ to weigh include:

> (1) the claimant's daily activities; (2) the location, duration,
> frequency and intensity of the claimant's pain or other symptoms;
> (3) precipitating and aggravating factors; (4) the type, dosage,
> effectiveness, and side effects of any medication the claimant takes
> or has taken to alleviate her pain or other symptoms; (5) treatment,
> other than medication, the claimant receives or has received for
> relief of her pain or other symptoms; (6) any measures the claimant
> uses or has used to relieve her pain or other symptoms; and
> (7) other factors concerning the claimant's functional limitations
> and restrictions due to pain or other symptoms.

*Id.* (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii)).

The ALJ assessed Buscemi's subjective complaints in the context of a

comprehensive review of the entire medical record.  In doing so, the ALJ accounted for the

relevant factors identified above and concluded that Buscemi described daily activities that were

inconsistent with his complaints of disabling symptoms and limitations, was noted to be evasive

during his partial hospitalization program, failed to consistently attend individual and group

therapy sessions, and made inconsistent statements about matters relevant to the issue of

disability.  Specifically, the ALJ noted that Buscemi had made inconsistent statements regarding

the following: (1) the last time he consumed alcohol; (2) whether he socializes with friends; and

(3) the side effects and efficacy of his medications.  (Tr. 19).  I conclude that the ALJ applied the

proper legal standards in analyzing Buscemi's subjective complaints and that substantial

evidence supports the ALJ's determination that Buscemi's complaints "are not credible" to the

extent they were inconsistent with the ALJ's RFC assessment. *See Luther v. Colvin*, 2013 WL 3816540, *7 (W.D.N.Y. 2013) (ALJ properly assessed subjective complaints where she "reviewed all of [p]laintiff's subjective complaints . . . [and] properly considered [p]laintiff's activities of daily living, inconsistent testimony and how her symptoms affected her attempts at maintaining a job").

Although Buscemi contends that the ALJ misstated portions of the record, I find that any misstatements were not material to the credibility analysis. The ALJ's decision states that Buscemi provided inaccurate reports concerning the date he last consumed alcohol. Indeed, the record does reflect conflicting statements concerning when Buscemi last consumed alcohol, with some treatment notes indicating that he reported March 2010 and other treatment notes suggesting March 2011. During the hearing, Buscemi testified that he had last consumed alcohol in March 2011, but upon further questioning conceded that he had consumed alcohol since that time at his brother's birthday party. (Tr. 43). In any event, the ALJ identified inconsistencies in other statements made by Buscemi beyond those relating to the consumption of alcohol.

Buscemi correctly notes that the ALJ inaccurately stated that Buscemi failed to complete the partial hospitalization program at URMC. A review of the records from URMC reveals that Buscemi completed the program and was discharged with a plan to obtain outpatient treatment at Unity Health System. (Tr. 271). Although the ALJ misstated the record, I conclude that even had the ALJ accurately recounted the treatment notes, the remaining evidence in the record identified by the ALJ was sufficient to support his adverse credibility determination. Accordingly, I conclude that the ALJ's misstatements of the record were harmless and that the credibility assessment is supported by substantial evidence. *See Andrews v. Colvin*, 2013 WL

31

5878114, *12 (W.D.N.Y. 2013) ("because there is substantial evidence supporting the remainder

of the credibility analysis, the ALJ's misstatement . . . is harmless and does not affect the

outcome of the case") (citing *Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 83 n.26

(N.D.N.Y. 2005) (noting that an ALJ's incorrect rendition of facts in the record is nothing more

than harmless error where his credibility assessment is amply supported by other substantial

evidence).

### C.     Assessment of Ability to Perform Past Work

Finally, I turn to Buscemi's contention that the ALJ erred when he determined that

Buscemi could perform his past work.  (Docket # 9-1 at 21-24; Docket # 14 at 5-6).  Buscemi

makes three challenges to the ALJ's step four determination.  First, Buscemi contends that the

ALJ erred when he relied upon the vocational expert's testimony because the testimony was

inconsistent with the DOT.  Second, Buscemi contends that the ALJ failed to inquire into the

mental demands associated with Buscemi's past work.  Finally, Buscemi contends that the ALJ

erred in relying on the vocational expert because the hypothetical posed to the expert was based

upon a flawed RFC assessment.

Buscemi's first challenge asserts that Andrews's testimony was inconsistent with

the DOT.  Andrews testified that Buscemi was previously employed as an injection molding

machine operator, which is listed in the DOT under number 586.685-038, and is characterized as

having an SVP[6] of 2 and requiring light exertion.  (Tr. 59).  According to Buscemi, this

---

[6] "'SVP' stands for 'specific vocational preparation,' and refers to the amount of time it takes an individual to learn to do a given job."  *Urena-Perez v. Astrue*, 2009 WL 1726217, *20 n.43 (S.D.N.Y.), *report and recommendation adopted as modified*, 2009 WL 1726212 (S.D.N.Y. 2009).  "Unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9."  *Crews v. Astrue*, 2012 WL 1107685, *12 n.5 (S.D.N.Y.) (quoting SSR 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000)), *report and recommendation adopted*, 2012 WL 2122344 (S.D.N.Y. 2012).

testimony is inaccurate because the position listed as DOT 586.685-038 carries an SVP of 4, not

2.  Having reviewed the relevant portions of the DOT, I conclude that Andrews merely misstated

the appropriate DOT number in her testimony.  The position associated with number

586.685-038 is titled "testing machine operator" with an SVP of 4.  *See* DICOT 586.685-038,

1991 WL 684436.  The position identified by Andrews, "injection molding machine tender," is

listed in the DOT under number 556.685-038 with an SVP of 2.  *See* DICOT 556.685-038, 1991

WL 683482.  The description of this position is consistent with Buscemi's testimony concerning

the responsibilities of his former employment.  Accordingly, I conclude that Andrews merely

misstated the DOT number associated with the position – a misstatement that was plainly

harmless.  *See Johnson v. Astrue*, 530 F. Supp. 2d 468, 476 (W.D.N.Y. 2008) ("[t]o invalidate

the vocational expert's testimony because he misstated the DOT numbers of the jobs he

identified, . . . would foolishly elevate form over substance"), *aff'd*, 324 F. App'x 57 (2d Cir.

2009).

I turn next to Buscemi's argument that the ALJ failed to inquire into the mental

demands of Buscemi's relevant past work.  "The regulations define 'past relevant work' as work

performed within the preceding fifteen (15) years, performed long enough for the claimant to

have learned how to do it, and which work constituted substantial gainful activity."  *Kochanek v.

Astrue*, 2010 WL 1705290, *10 (N.D.N.Y.) (citing 20 C.F.R. § 416.965), *report and

recommendation adopted*, 2010 WL 1713438 (N.D.N.Y. 2010).  "[I]n the fourth stage of the

[disability] inquiry, the claimant has the burden to show an inability to return to [his] previous

specific job and an inability to perform [his] past relevant work generally."  *Jasinski v. Barnhart*,

341 F.3d 182, 185 (2d Cir. 2003).  "[I]n order to determine at step four whether a claimant is able

to perform [his] past work, the ALJ must make a specific and substantial inquiry into the relevant physical and mental demands associated with the claimant's past work, and compare these demands to the claimant's residual capabilities." *Matejka v. Barnhart*, 386 F. Supp. 2d at 204-05 (internal quotations omitted).  In making this inquiry, "[a]n ALJ may rely on the claimant's statements, which 'are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work.'"  *Kochanek v. Astrue*, 2010 WL 1705290 at *11 (quoting SSR 82-62, 1982 WL 31386, *3).  "An administrative law judge also may consult with a vocational expert witness who can provide evidence of 'physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy.'"  *Mathews v. Colvin*, 2014 WL 837712, *8 (N.D.N.Y. 2014) (quoting 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2)).

          During the hearing, the ALJ elicited testimony from Buscemi regarding both the physical and the mental demands of his prior relevant work.  Buscemi testified that he worked on an injection plastics mold machine, which required him to "[p]ress a button, take the part out." (Tr. 34).  Buscemi also testified that once the plastic piece was completed, he had to remove the piece and inspect it for damage or for "burrs."  (Tr. 53).  If there was a burr, he would have to grind the piece to remove the burr.  (*Id.*).  According to Buscemi, the job did not require any heavy lifting.  (Tr. 34).  Buscemi testified that he was trained by another employee for approximately one to two hours to learn the requirements of the position.  (*Id.*).  According to Buscemi, he worked alone or with one other person and had to interact with supervisors.  (Tr. 53-54).  The ALJ did not elicit similar testimony concerning Buscemi's previous employment as a forklift operator.

34

The ALJ also elicited testimony from Andrews, the vocational expert.  Based upon Buscemi's testimony, she classified each of his relevant past employment positions by a DOT number and title.  She then provided the ALJ characteristics of those positions, including the exertion levels and SVP, as they are typically performed in the national economy and as they were actually performed by Buscemi based upon his testimony.  (Tr. 59-60).  She testified that Buscemi previously worked as an injection molding machine tender under DOT number 586.685-038,[7] which characterizes the position as unskilled, light exertion, with an SVP of 2. (Tr. 59).  She also testified that Buscemi had previously worked as an industrial truck operator under DOT 921.683-050, which is characterized as semi-skilled, medium exertion, with an SVP of 3.  (*Id.*).  Andrews also opined that an individual with Buscemi's limitations could perform the occupations of industrial truck operator and injection molding machine tender.  (Tr. 60-61).

Buscemi contends that the ALJ failed to elicit any evidence concerning the stress related to Buscemi's previous employment or whether he worked with other employees. Although the ALJ did not elicit testimony from Buscemi concerning the mental demands associated with his employment as an industrial truck operator, he did elicit testimony from Buscemi concerning the mental demands of his position as an injection molding machine tender, including the tasks required and the number of employees with whom Buscemi was required to interact.  In addition, the ALJ consulted a vocational expert, who opined that an individual with Buscemi's limitations could perform his prior work as both an industrial truck operator and an injection molding machine tender.  The ALJ then compared Buscemi's RFC with the physical and mental demands of his previous work and concluded that Buscemi was "able to perform [the

---

[7]  As discussed above, Andrews misstated the DOT number, which should have been 556.685-038.

previous work] as actually and generally performed."  (Tr. 19).  Accordingly, I conclude that the ALJ adequately inquired as to the mental demands of Buscemi's previous employment as an injection molding machine tender and that his conclusion at step four is supported by substantial evidence in the record.  *See Mathews v. Colvin*, 2014 WL 837712 at \*8 (ALJ adequately inquired into mental demands of previous work where he elicited testimony from claimant regarding previous work responsibilities and consulted a vocational expert).

Finally, Buscemi contends that the ALJ erred in relying on the vocational expert because the hypothetical posed to the expert was based upon a flawed RFC assessment.  (Docket # 9-1 at 24; Docket # 14 at 5-6).  Having determined that substantial evidence supports the ALJ's RFC determination, this argument is rejected.  *See Wavercak v. Astrue*, 420 F. App'x 91, 95 (2d Cir. 2011) ("[b]ecause we have already concluded that substantial record evidence supports the RFC finding, we necessarily reject [plaintiff's] vocational expert challenge").

## CONCLUSION

After careful review of the entire record, this Court finds that the Commissioner's denial of SSI/DIB was based on substantial evidence and was not erroneous as a matter of law.  Accordingly, the ALJ's decision is affirmed.  For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 8)** is **GRANTED**.  Buscemi's motion for

judgment on the pleadings **(Docket # 9)** is **DENIED**, and Buscemi's complaint (Docket # 1) is

dismissed with prejudice.

**IT IS SO ORDERED.**


                                                              *s/Marian W. Payson*
                                                        MARIAN W. PAYSON
                                                     United States Magistrate Judge


Dated: Rochester, New York
          September 24, 2014